# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

VIP OF BERLIN, LLC,
     Plaintiff,

     v.

TOWN OF BERLIN, HERMAN
MIDDLEBROOKS, JR., in his official
capacity as Town Manager of the Town of
Berlin, and DENISE McNAIR, in her official
capacity as the Town Manager of the Town
of Berlin,
     Defendants.

CIVIL ACTION NO.
3:06cv1811 (SRU)

## RULING ON MOTION FOR PRELIMINARY INJUNCTION

Plaintiff VIP of Berlin, LLC ("VIP") seeks a preliminary injunction enjoining the

defendant Town of Berlin ("Berlin") and its agents, officers, and representatives from enforcing

the definition of "adult oriented store" contained in Berlin Code of Ordinances § 14-242 against

VIP to prohibit the operation of a general retail store at VIP's premises in Berlin.  VIP contends

that the language of Berlin's sexually oriented business ("SOB") ordinance, which defines any

retail establishment having "a substantial or significant portion of its stock in trade in Adult

Books, Adult Videos or Adult Novelties" as an "adult oriented store," i.e., an SOB requiring a

license, is unconstitutionally vague as applied to VIP's present business plan, which was

submitted to Berlin's zoning enforcement officer on March 26, 2009.  In its application for a

certificate of zoning compliance, VIP stated that it did not intend to operate as an "adult oriented

store" because no more than 12% of its stock in trade[1] would be considered "adult videos,"

"adult novelties," and "adult books," as defined by the Berlin SOB ordinance.  Berlin's zoning

---

[1] Black's Law Dictionary defines "stock in trade" as "[t]he inventory carried by a retail
business for sale in the ordinary course of business."  (8th ed. 2004).

officer denied VIP's application on the ground that Berlin's town manager, Denise McNair, determined that VIP's proposed use fell within the definition of an SOB, and therefore, required an SOB license before the zoning application could be approved.  Because VIP's premises are within 250 feet of a residentially zoned area, Berlin determined it was not eligible for an SOB license and denied the zoning application.

A hearing on the plaintiff's motion for a preliminary injunction was held June 23, 2009. The following are my findings of fact and conclusions of law concerning issues raised by the motion for preliminary injunction.  For the reasons that follow, I conclude that, in the absence of a preliminary injunction, VIP will suffer irreparable harm and has demonstrated a clear likelihood of success on the merits of its as-applied vagueness challenge, and therefore, the motion for preliminary injunction is GRANTED.

## I.   Factual Background

VIP owns an approximately 15,000 square foot commercial building located at 717 Berlin Turnpike in Berlin, Connecticut.  The property is presently zoned for retail use.

On July 25, 2006, VIP applied for a certificate of zoning compliance, seeking to open a store for the retail sale of clothing, novelties, books, magazines, films, video cassettes, and DVDs.  Pl. Ex. A at 2.  VIP stated that less than a majority of its stock in trade would consist of items of an "adult" nature, including books, magazines, films, videos, DVDs, and sex enhancing adult novelties and marital aids.  Under Berlin's SOB ordinance in place at that time, the definition of an "Adult Bookstore" or "Adult Video Store" was a retail establishment having a

majority of its stock and trade[2] in adult books, magazines, videos, and the like.  The ordinance additionally defined an "Adult Novelty Store" as "any establishment having a substantial or significant portion of its stock and trade" in adult novelty products.  Despite VIP's representation that no more than 35% of its inventory would be "adult" products, Berlin's zoning officer denied VIP's application on the ground that VIP was an SOB and did not have the appropriate license. VIP's subsequent appeal to the Berlin Board of Zoning Appeals was denied.

In the meantime, on October 5, 2006, the Berlin Town Council amended its SOB licensing ordinance to create a single category of business known as an "Adult Oriented Store," which is defined as any establishment having "a substantial or significant portion of its stock in trade in Adult Books, Adult Videos or Adult Novelties or any combination thereof."  Berlin Code § 14-242.  Adult oriented stores fall into the category of "sexually oriented businesses," which require an SOB license to operate in Berlin.  *Id.*

On March 30, 2007, VIP filed a new application for a certificate of zoning compliance along with a proposed inventory list, stating that none of its proposed items for sale could be construed as "adult novelty" or "adult video" as defined in the Berlin SOB ordinance.  Pl. Ex. C. In April 2007, Berlin denied the application, stating that a significant and substantial portion of VIP's proposed inventory list consisted of adult novelties, thus making VIP an SOB and that an SOB license would be required before the zoning application could be approved.  Pl. Ex. D.  VIP resubmitted its application on June 6, 2007, with a revised inventory list that eliminated some of the items that were of concern to the town zoning officer.  Second DeMartino Aff. at ¶6.  After

_____

[2] It is worth noting that Berlin's pre-October 5, 2006 SOB ordinance had the phrase "stock and trade;" the current version uses the phrase "stock in trade."  Both phrases are found in the relevant case law and are taken to be interchangeable.

submitting that application, the zoning officer indicated orally to VIP's principal, Dominick

DeMartino, that she intended to deny that application for the same reason that she denied the

March 30 application and, therefore, VIP withdrew its June 6 zoning application on June 8, 2007.

*Id.*

On March 26, 2009, VIP submitted a new application for a certificate of zoning

compliance, along with a proposed inventory list and proposed floor plan.  VIP's application and

inventory list indicated that 12% of VIP's Berlin store's stock in trade would consist of books,

magazines, DVDs, and novelties or products that could be defined as "adult videos," "adult

books," or "adult novelties" as defined by the Berlin SOB ordinance.  Pl. Ex. F.  Out of 67,237

products VIP intended to stock in its Berlin store, the proposed inventory list identified 8,242

adult products such as DVDs for rent,[3] DVDs for sale, magazines,[4] sex positive lubricants,[5] and

sex positive toys.[6]  *Id.*  DeMartino testified that, in practice, he planned to stock approximately

---

[3] Under Berlin Code § 14-242, "Adult Videos" means "films, motion pictures, videocassettes, DVDs, software, slides or other pornographic reproductions that depict, display or describe specified anatomical areas or specified sexual activities" as those areas and activities are defined by the Berlin Code.

[4] Berlin Code § 14-242 defines "Adult Books" as "any books, magazines, periodicals, pamphlets, or other printed materials that depict, display or describe specified anatomical areas or specified sexual activities" as those areas and activities are defined by the Berlin Code.

[5] The definition of "Adult Novelties" includes the category of "oils, lotions, gels or creams that are designed for or marketed primarily for use upon specified anatomical areas and intended for stimulating human genital organs, sexual arousal or as an aid to enhance or promote specified sexual activities."  Berlin Code § 14-242.

[6] The term "Adult Novelties" includes "instruments, devices, toys or paraphernalia that are designed for or marketed primarily for stimulating human genital organs, sexual arousal or sadomasochistic use" and "instruments, devices, gag gifts, toys or paraphernalia that depict, display or are shaped in the form of specified anatomical areas."  Berlin Code § 14-242.

10% adult items at the Berlin store in order to give himself some leeway in complying with his certificate of zoning compliance in the event of a shortage of non-adult inventory.  6/23/09 Tr. at 19-20, 37-38.

On May 11, 2009, Berlin's Chief Zoning Enforcement Officer, Hellyn Riggins, denied VIP's zoning application on the ground that the Berlin Town Manager, Denise McNair, had determined that VIP's proposed use would require an SOB license.[7]  Pl. Ex. G.  McNair testified that she made her determination by consulting VIP's application, the proposed inventory list, and its proposed floor plan.  6/23/09 Tr. at 64-65.  According to McNair, "based on those items and [her] own experience" she determined that VIP's proposed use required an SOB license.  *Id.* at 71.  She conceded that she never viewed the actual products firsthand but stated that she had "knowledge" of such items and that she had "seen" sexually explicit media before.  *Id.* at 80.

McNair testified that she did not employ a mathematical definition for determining that the adult products on VIP's proposed inventory list represented a substantial or significant portion of its stock in trade.  *Id.* at 67, 71-72.  McNair testified that, although she did not have an absolute number of adult items in mind that would necessarily trigger the need for an SOB license, she nevertheless determined that VIP's proposed 8,000-plus adult items were "definitely" a substantial or significant portion of its stock in trade because those items were "a significant portion of . . . what was important in [VIP's] particular application."  *Id.* at 72, 74-75.  She could not say whether there was a number or percentage of adult items below which VIP would not need an SOB license to operate.  *Id.* at 72, 75.

---

[7] Under the Berlin SOB ordinance, the town manager has the authority to review and grant or deny applications for SOB licenses.

When pressed to explain how a new business seeking to open in Berlin would know whether it would require an SOB license to commence operations, McNair testified that she believed most businesses would know one way or the other.  *Id.* at 78-79.  McNair acknowledged that there were no published guidelines or any publicly available instructions or other guidance that businesses could review in advance of applying for a zoning compliance certificate other than the ordinance itself.  *Id.* at 75.  Although she "found it hard to believe that [a business] wouldn't be sure" whether it required an SOB ordinance, she testified that a prospective business would know whether it would need an SOB license either "after speaking to [her] or after reading the ordinance."  *Id.* at 72, 78-79.

When asked to define "substantial or significant," McNair testified that "substantial or significant" means "meaningful to either the business or the Town of Berlin. . . .  It would have import to the business.  It would have meaning to the town under the ordinance."  *Id.* at 73.  McNair defined portion as "an amount, a part of something."  *Id.* at 76.  According to McNair, the ordinance's terms do not trigger a specific percentage of stock in trade or an absolute number of trade items for her.  *Id.* at 74.  By way of example, she stated that a substantial or significant portion of a sandwich "can be a bite.  It can be almost the whole sandwich" depending on whose sandwich it was – "if you're starving and someone takes two bites of your sandwich, it could be significant to the person who's starving."  *Id.* at 76-77.

Her practice is to evaluate each application "for what it actually is" and that it was necessary to examine each case "individually . . . to really understand and take a look at each application . . . and then go from there."  *Id.* at 74, 78.  For example, McNair testified, because a 7-Eleven convenience store is not primarily in business to sell adult magazines, the fact that it

does sell adult magazines does not make that a substantial portion of its business. *Id.* at 74. If that 7-Eleven suddenly changed the nature of its business, i.e., becoming more reliant on those items for profits and clientele, it would "perhaps need a sexually oriented business license in that case." *Id.* at 77-78.

According to DeMartino, his "only intent in applying for a zoning permit is to operate a lawful, non-adult general retail establishment" and that he purposely chose to carry only 12% adult products because he does not want to operate as a adult business at this time. First DeMartino Aff. at ¶¶ 5-6. DeMartino testified that, although he wishes to eventually open a "fully" adult store at his Berlin premises pending the outcome of the other segment of this litigation, he is currently attempting to comply with the SOB ordinance by keeping his adult inventory below a substantial or significant portion of his stock in trade. 6/23/09 Tr. at 14, 25-26, 55-56. Despite his attempts to comply with the ordinance, DeMartino still does not understand what he needs to do qualify as a general retail establishment with less than a substantial or significant portion of his stock in trade in adult items. *Id.* at 16.

## II.    Discussion

### A.    Standard of Review

"A party seeking a preliminary injunction must demonstrate: (1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, and (2) irreparable harm in the absence of the injunction." *Faiveley Transport Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 116 (2d Cir. 2009) (internal quotation and citation omitted). Where the movant is challenging a government action taken pursuant to a statutory or regulatory scheme, it

must demonstrate irreparable harm and a likelihood of success on the merits.  *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996).  Finally, because a preliminary injunction would alter, rather than maintain, the status quo, i.e., by permitting VIP to open a general retail establishment at its Berlin Turnpike location where it is not currently operating, VIP must show a "clear" or "substantial" likelihood of success on the merits.  *Id.*

      B.      <u>Irreparable Harm</u>

VIP contends that it will suffer, and is suffering, irreparable harm absent a preliminary injunction because it is being prohibited from exercising its First Amendment right to display and disseminate expressive videos, publications, and books due to Berlin's characterization that it is an SOB requiring an SOB license to operate.   Berlin contends that VIP should not get a "free pass" on the issue of irreparable harm simply because VIP alleges that its First Amendment rights are being violated and that the SOB ordinance is a valid time, place, and manner restriction that is properly focused on the secondary effects of such protected expression.

Berlin's argument appears to address an issue raised by this litigation but not pertinent to the preliminary injunction motion, i.e., whether Berlin's SOB ordinance is a permissible time, place, and manner restriction on otherwise protected sexual expression.  The present issue before the court is whether Berlin is unfairly characterizing VIP as an adult oriented store requiring an SOB license when VIP claims its proposed inventory is insufficient to qualify it as an SOB. Because Berlin has denied VIP's application to operate as a general retail establishment that has a portion of its stock in trade dedicated to sexually explicit materials protected by the First Amendment, under established precedent VIP is undoubtedly being prohibited from engaging expression protected by the First Amendment.

In *Paulsen v. County of Nassau*, 925 F.2d 65, 68 (2d Cir. 1991), the Second Circuit reiterated that "our historical commitment to expressive liberties dictates that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Non-obscene, sexually explicit expressive materials are entitled to protection under First Amendment.[8] *Roth v. United States*, 354 U.S. 476, 487 (1957). *See also United States v. Williams*, __ U.S. __, 128 S. Ct. 1830, 1835-36 (2008) ("We have long held that obscene speech – sexually explicit material that violates fundamental notions of decency – is not protected by the First Amendment. But to protect explicit material that has social value, we have limited the scope of the obscenity exception, and have overturned convictions for the distribution of sexually graphic but nonobscene material.") (internal citations omitted); *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 70 (1976) ("[W]e recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value . . . ."); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 208 (1975) (noting that non-obscene sexual expression has First Amendment protection).

The dissemination of protected expression is also protected under the First Amendment. *See Smith v. California*, 361 U.S. 147, 150 (1959) ("[T]he free publication and dissemination of books and other forms of the printed word furnish very familiar applications of these constitutionally protected freedoms [of the press and of speech]. It is of course no matter that the dissemination takes place under commercial auspices. Certainly a retail bookseller plays a most

---

[8] Berlin does not contend that the adult products that VIP intends to offer for sale are "obscene." In addition, there is no dispute that minors would not have access to the materials sold by VIP because its policy would prohibit anyone under the age of 18 from entering the store.

significant role in the process of the distribution of books.") (internal citation omitted); *cf.*

*Lerman v. Flynt Distributing Co.,* 745 F.2d 123, 139 (2d Cir. 1989) ("First Amendment

guarantees have long been recognized as protecting distributors of publications.").

Because Berlin's denial of VIP's zoning application ostensibly prohibits VIP from

disseminating sexually explicit materials protected under the First Amendment, VIP has

sufficiently demonstrated irreparable harm.

C.    Clear or Substantial Likelihood of Success on the Merits

VIP argues that the SOB ordinance's definition of an adult oriented store as any

establishment having "a substantial or significant portion of its stock in trade" is

unconstitutionally vague as applied to VIP's most recent proposed business plan.  VIP contends

that the vagueness of the law is evidenced by VIP's several failed attempts to obtain a certificate

of zoning compliance and the town's inability to enunciate any standard by which a business

could determine whether a significant or substantial portion of its stock in trade consisted of

adult items.  Berlin argues that the phrase "a substantial and significant portion of its stock in

trade" is not vague and is capable of being understood by persons of ordinary intelligence, that

VIP's inventory of 8,242 sexually explicit items represents a significant and substantial portion

of VIP's stock in trade, and that the town must be "given leeway to know a sexually oriented

business when it sees one" and to determine what portion of inventory would be substantial or

significant.  Berlin Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary

Injunction at 23.

1.      *As-Applied Vagueness Challenges*

The Second Circuit has adopted a two-part analysis for as-applied void for vagueness claims.  First, the court must determine "whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited."  *Rubin v. Garvin*, 544 F.3d 461, 468 (2d Cir. 2008) (internal quotation omitted).  Second, the court must "consider whether the law provides explicit standards for those who apply it."  *Id.* (internal quotation omitted).  To prevail on its vagueness claim, therefore, VIP must demonstrate: (1) that the phrase "a substantial or significant portion of its stock in trade" does not provide persons of ordinary intelligence seeking to open a business in Berlin, with some amount of adult materials in stock, a reasonable opportunity to know whether they must seek an SOB license before commencing operations, and (2) that the ordinance does not provide explicit standards to those town officials charged with interpreting and enforcing the ordinance.

It is pertinent to note that the "degree of vagueness tolerated in a statute varies" depending on whether it is an economic regulation or a law that might infringe on the exercise of constitutionally protected rights.  *Id.* at 467 (citing *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982)).  "Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts."  *Smith v. Goguen*, 415 U.S. 566, 573 (1974).

In *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972), the Supreme Court held that where a law's prohibitions are not clearly defined, it is "void for vagueness."  As the Court explained:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.  Vague laws may trap the innocent by not providing fair warning.  Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.  A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.  Third, but related, where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms.  Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.

*Id.* at 108-09 (internal quotations and alterations omitted).  Courts have regularly applied this due process principle to cases implicating the First Amendment.  *See, e.g., Wisconsin Vendors, Inc. v. Lake Country, Ill. ("Wisconsin Vendors I")*, 152 F. Supp. 2d 1087, 1094 (N.D. Ill. 2001).  "[A] law restricting speech is impermissibly vague if it fails to provide fair notice to reasonable persons of what is prohibited, or if it fails to provide reasonably clear guidelines for law enforcement officials, resulting in a 'chilling' effect on speech protected by the First Amendment."  *Id.*

Several state supreme courts have examined the vagueness of similarly worded municipal ordinances in the sexually oriented business context and have concluded that the ordinances are unconstitutionally vague.  In *City of Knoxville v. Entertainment Resources, LLC*, 166 S.W.3d 650, 652 (Tenn. 2005), the city sought an injunction against a video store operator for its failure to obtain an SOB license after determining the store was an adult bookstore within the meaning of its SOB ordinance.  The Tennessee Supreme Court struck down the ordinance as unconstitutionally vague, concluding that the phrase "substantial and significant portion of its

stock and trade" was impermissibly vague because the "ordinance fail[ed] to provide

ascertainable standards for law enforcement" and the ordinance's terms could not be "defined to

any degree of precision" so as to indicate what conduct was prohibited.  *Id.* at 656-57.

The Court first noted that "the inability of the officers charged with enforcing the

ordinance to define its key terms weighs heavily against the ordinance's constitutionality."  *Id.* at

656.  At trial, none of the testifying officers offered a coherent definition of "substantial."  *Id.*

Those officers testified that, although the city had provided them with no formal guidance on

what constituted a substantial portion of adult materials, "they, personally, knew what

'substantial' meant."  *Id.*   According to the Court, "'I know it when I see it' is not a

constitutionally-sound standard" because "when speech is being regulated, the Constitution

demands that government bodies make a greater attempt to define what conduct is prohibited to

avoid chilling protected speech."  *Id.*  The witness testimony demonstrated that the ordinance's

enforcement was "left to the 'personal predilections' of the police," and the confusion

demonstrated that the ordinance "fail[ed] to provide ascertainable standards for law

enforcement."  *Id.* at 657 (quoting *Goguen*, 415 U.S. at 575).

Second, the Tennessee Supreme Court was troubled that the "terms as used in the context

of the ordinance cannot be defined with any degree of precision."  *Id.*  The Court specifically

rejected the city's argument that, because the terms "substantial" and "significant" appear

hundreds of times in state and federal statutes, they were sufficiently familiar terms that persons

of ordinary intelligence could readily comprehend.  *Id.*  Explaining that "it is not the words

themselves that must be capable of ready understanding by persons of ordinary intelligence, but

the conduct that is prohibited that must be readily understood," the Court held that the terms

failed to offer any guidance beyond the insufficient explanation that any business having "a certain, undefined amount of sexually-explicit material [would be] subject to the location restrictions of the ordinance." *Id.*

Finally, the Court was troubled by the city's reluctance to offer clarification on the ordinance's meaning, even after several failed attempts by the video store to comply with the ordinance by reducing its inventory of adult-oriented material. *Id.* at 658 ("After each alteration, the City continued to maintain that Fantasy Video was in violation of the ordinance. In our view, requiring a party to engage in this sort of guessing game is a clear violation of due process."). The Court noted that the city must have some idea of what "substantial or significant portion of its stock and trade" meant because it had not sought enforcement of the ordinance against another video store carrying sexually explicit materials. *Id.* The Court concluded that "[i]n the absence of any articulable standards from the City, . . . the ordinance is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.'" *Id.* (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (2005)).

Similarly, in *105 Floyd Road, Inc. v. Crisp County*, 613 S.E.2d 632, 636 (Ga. 2005), the Georgia Supreme Court considered whether the phrase "substantial business purpose" was impermissibly vague, holding that the ordinance was unconstitutional because it failed to give fair notice to a reasonable person whether a business qualified as an SOB and because it gave no clear guidelines to the municipal officials charged with its enforcement. The ordinance "thus impermissibly delegate[d] to them 'basic policy matters . . . for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.'" *Id.*

(quoting *Grayned*, 408 U.S. at 109).  Excluding the most obvious examples of stores that sold *only* sexually explicit items, the Court held that reasonable persons were left to guess at what point the offering of sexually-explicit material became the substantial purpose of its business.  *Id.* at 635.

Of significance to the Court was the county officials' focus on the non-sexually-explicit materials offered by the establishment in determining whether it qualified as an SOB.  For example, one county official testified that a gas station or convenience carrying a rack of sexually explicit magazines would not be subject to the ordinance because selling such material was not part of those stores' "'regular' business."  *Id.*  "[E]ven though the other items available at the business did not fall within the category of sexually-explicit materials regulated by the County, the County nevertheless used the adult theme of this other material, particularly the fact that these items cater to the sexual interests or activities of adults, as the means to establish appellant's 'substantial business purpose' in offering the regulated material."  *Id.*  The Court concluded that the ordinance's vagueness was responsible for the county's application of such impermissible "content-based analysis" to determine whether its "substantial business purpose" was to sell sexually-explicit material.  *Id.* at 635-36.

Finally, in *City of Columbia v. Pic-a-Flick Video, Inc.*, 531 S.E.2d 518, 520, 523 (S.C. 2000), the Supreme Court of South Carolina determined that an ordinance that defined an SOB as "a commercial establishment which, as one of its principal business purposes, offers for sale or rental" certain adult media and toys, was impermissibly vague under *Grayned*.  At trial, the city official charged with enforcing the ordinance admitted that even one adult movie would make the business an SOB; the Court concluded that the trial court had not erred in refusing to

grant an injunction against a video store offering adult videos for rental or sale where the city had failed to articulate a definition of the phrase "principal business purpose." *Id.* at 522.

In *Wisconsin Vendors I*, the United States District Court for the Northern District of Illinois granted the plaintiff's request for a preliminary injunction against enforcement of the city's SOB ordinance against its video store; the SOB ordinance classified an adult store as any commercial establishment that devoted a "substantial or significant portion of its business" to selling, renting, or viewing adult materials. 152 F. Supp. 2d at 1088-89. Despite the plaintiff's repeated efforts to get clarification from the city to ascertain what level of adult materials would not render it subject to the SOB ordinance and by actually reducing its inventory of adult materials on several occasions without success, the city officials refused to offer specific guidelines other than indicating that Blockbuster Video did not have a substantial or significant portion of its business in offering adult materials for sale, rental or viewing. *Id.* at 1090-91. Noting that the case highlighted the "central concerns of the *Grayned* court," namely that the business could not fairly discern whether it was in violation of the ordinance and the ordinance gave county officials "virtually unfettered discretion" to determine whether the plaintiff was subject to the SOB ordinance, the Court held that a business owner "should not be forced to accept a repeated trial-and-error enforcement mechanism because the County refuses to engage in any attempt to clarify the reach of the statute." *Id.* at 1095-96. The example of Blockbuster Video was insufficient because, as an extreme example on one end of the spectrum, "that is really no guidance at all, for there must be some level of sales, rentals, or inventory of adult materials (above zero) that does not constitute a "substantial or significant portion of [a] business." *Id.* at 1097. Because the factual history revealed that the plaintiff could not determine

-16-

what it had to do to avoid regulation and that the county officials had a "wide range of discretion

. . . opening the door for arbitrary and discriminatory enforcement," the Court concluded that the

plaintiff had shown a sufficient likelihood of success on the merits of its claim and granted the

preliminary injunction.[9]

2.    *VIP's As-Applied Vagueness Challenge*

a.    Fair Notice of Prohibited Conduct

I conclude that VIP has demonstrated a clear and substantial likelihood of success on the

merits of its as-applied vagueness challenge.  Starting with the first prong of the as-applied

vagueness test – whether the statute gives a person of ordinary intelligence a reasonable

opportunity to know what is prohibited – the facts demonstrate that the language of the ordinance

provides no discernible guidance to VIP on what constitutes a "substantial or significant portion

of its stock in trade."  As VIP's particular circumstances demonstrate, there is nothing about the

language of the ordinance from which it could determine how much, or what percentage, of its

stock in trade could consist of adult media and adult novelties without making it subject to the

---

[9] In a subsequent decision on the merits of the plaintiff's as-applied and facial vagueness claims, the court granted summary judgment for the city because of an intervening Seventh Circuit decision that summarily rejected a claim that the phrase "significant or substantial portion of its interior business" was vague as "meritless."  *Wisconsin Vendors, Inc. v. Lake County, Ill. (Wisconsin Vendors II")*, 2003 WL 366580 at *3-4 (N.D. Ill. 2003).  The Court, however, strenuously disagreed with the Seventh Circuit's holding, noting the cases the Seventh Circuit relied on were not on point for the vagueness challenge, but nevertheless felt bound by circuit precedent.  *Id.* at *4.  This court is not bound by Seventh Circuit precedent, and I find the reasoning of *Wisconsin Vendors I* to be persuasive.

Notably, after the *Wisconsin Vendors I* Court granted the preliminary injunction, the defendant county rewrote its SOB ordinance by making 30% of gross sales, floor area, inventory, or stock in trade the threshold for determining whether a store was a covered "adult store."  *Id.* at *2.  In light of those changes, the *Wisconsin Vendors II* Court vacated the injunction based on the prior ordinance.  *Id.* at *5.

SOB ordinance's licensing scheme.  The language "substantial or significant portion of its stock in trade" suggests that a retail establishment could have something more than zero percent adult media and adult products without being classified as an "adult oriented store."  As evidenced by VIP's numerous failed attempts to determine that divining line, however, it is not readily apparent from the face of the ordinance what amount of stock in trade would qualify as a substantial or significant portion.

According to McNair, the town's only guidance on this issue is that a prospective business owner can either (1) read the ordinance, or (2) schedule a meeting with her to work out the details of what would constitute a substantial or significant portion of that business's stock in trade.  Neither option provides the necessary clarity demanded of statutes operating in areas of First Amendment-protected expression.  As evidenced by VIP's particular experience, reading the ordinance is insufficient to provide a prospective business owner any guidance regarding how much of its stock in trade can legally consist of adult products without being classified as an adult oriented store.  Additionally, Berlin has cited no case where an ordinance was deemed to be sufficiently clear in the face of an as-applied vagueness challenge where each prospective vendor would be required to have a sit-down with town officials to first determine how to properly conform his or her behavior to the strictures of the statute.

Furthermore, McNair's explanation that businesses will simply "know" whether or not they require an SOB license to operate is perfectly vague and completely illustrative of the problem facing VIP.  Unlike those businesses that may desire to sell nothing more than a nominal amount of sexually explicit materials, such as 7-Eleven, Barnes & Noble, or Victoria's Secret, as a store that would like to have more than a de minimis amount of adult products, but less than a

substantial or significant portion of its stock in trade (a situation contemplated by the plain language of the ordinance), VIP has no way of discerning where the magic threshold delineating general retail establishment from an adult oriented store lies.  The language of the statute – which Berlin contends is clear enough to guide prospective business owners generally and VIP specifically – simply does not provide any person fair notice of how he can conform his conduct to the law.

The fact that "substantial" and "significant" have commonly understood meanings outside the SOB context does not supply those terms with a sufficiently discernible meaning in the present context where VIP is attempting to avoid being classified as an SOB.  Berlin argues that "substantial" means "considerable in amount, extent, value, or importance," and the like, and that "significant" means "having or conveying a meaning," and the like, and therefore the ordinance is not void for vagueness.  That argument, however, brings the ordinance no closer to providing a person of ordinary intelligence with means to decipher what portion of stock in trade will be less than substantial or significant, but greater than zero.

Berlin cites to several cases for the proposition that those terms, and the pertinent phrase itself, are not unconstitutionally vague:  *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1160 (10th Cir. 2006) (holding that the SOB ordinance's definition of adult bookstore as one with a "significant or substantial portion" of its stock, floorspace, or revenue devoted to adult media or adult toys was not unconstitutionally vague on its face); *ILQ Investments, Inc. v. City of Rochester*, 25 F.3d 1413, 1419 (8th Cir. 1994) (holding that the ordinance defining an adult bookstore as one with a "substantial or significant portion of [adult] items" was not unconstitutionally vague on its face because those terms appear "frequently" in the U.S. Code);

*15192 Thirteen Mile Road, Inc. v. City of Warren*, 626 F. Supp. 803, 820-21 (E.D. Mich. 1985) (same).  Those cases are distinguishable for several important reasons.

First, those cases involved facial challenges, which require a higher standard for proving unconstitutional vagueness than do as-applied challenges.  When mounting a facial vagueness challenge, "a party must show, at a minimum, that the challenged law would be vague in the vast majority of its applications: that is, that 'vagueness permeates the test of the law.'" *Dr. John's*, 464 F.3d at 1157 (quoting *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999)).  Consequently, because the *Dr. John's* Court believed there were "myriad instances" in which a business, such as Victoria's Secret or, on the other end of the spectrum, a store carrying only adult videos and toys, "would have no doubt" whether the ordinance applied to its business operations, it determined the ordinance was not unconstitutionally vague.  *Id.* at 1158.

Second, to the extent those cases rely on the presence of the terms "substantial" and "significant" in the U.S. Code, that argument is unconvincing.  There is no indication whether those instances of the "substantial" or "significant" have been statutorily or judicially defined for the context in which they operate so that those terms are, in practice, clearer than the language itself would otherwise suggest.  Next, there is no indication whether or not those statutes operate in the area of expression protected by the First Amendment, which would require a greater degree of specificity than laws regulating non-constitutionally protected conduct.  *Guguen*, 415 U.S. at 573.  For example, the *ILQ Investments* and *15192 Thirteen Mile Road* Courts point to 42 U.S.C. § 2000a(c), a public accommodation provision in the 1964 Civil Rights Act, which contains the phrase "[t]he operations of an establishment affect commerce if a substantial portion of the food which it serves . . . has moved in commerce."  Significantly, however, that statute

does not restrict the exercise of constitutional rights protected under the First Amendment and is thus subject to a lower standard of specificity as a general matter. *See Wisconsin Vendors I*, 152 F. Supp. 2d at 1098. As stated succinctly by the *Wisconsin Vendors I* Court, the cases using the instances of "substantial" and "significant" in statutes as a basis for determining the phrase "substantial or significant portion" is not facially vague "do not carefully examine the contexts in which these terms are used, nor do they discuss whether these other statutory provisions have ever been challenged on vagueness grounds. Most importantly, the cases never point to the use of the terms in statutes that restrict First Amendment freedoms." *Id.* It is not the words themselves that must be readily understood by the person of ordinary intelligence, but the conduct that the statute prohibits. *Entertainment Resources*, 166 S.W.3d at 657. Therefore, I do not find the cases relied upon by Berlin to defend the clarity and non-vagueness of its SOB ordinance's definition of adult oriented store to be persuasive.

> b.   Explicit Standards for Enforcement

VIP has also successfully demonstrated a clear and substantial likelihood of success on the second prong of the as-applied vagueness analysis: whether the ordinance provides explicit standards for those who apply it. As evidenced by McNair's testimony, the town manager clearly enjoys, and has exercised, a broad range of authority to apply the SOB ordinance in ways that tend towards the arbitrary end of the discretionary spectrum. For example, McNair testified that she has no specific percentage or absolute number in her mind when considering whether VIP, or any other prospective business, qualifies as an SOB. Rather, she relies on her own determination whether the adult materials are "meaningful" to the business or the town. Defense counsel argued at the hearing that DeMartino's subjective frame of mind, i.e., that he considers himself to

be a purveyor of adult items, was important for determining whether the 12% of stock in trade in adult media and novelties was "substantial."  Tr. at 103-04 ("It's meaningful to [DeMartino].  It's probably the most meaningful portion of all of his stock, to him, because that's what he does.").

Such subjective determinations have no place in the enforcement of statutes operating in the realm of First Amendment protected expression.  The fact that DeMartino is an owner of "fully" adult VIP stores in Orange, Hartford, and Manchester, which carry many more adult items representing a higher percentage of the stock in trade of those stores, is not relevant to the issue whether the Berlin store's proposed inventory of 12% adult materials is a substantial or significant portion of its stock in trade or what percentage of adult materials would render it an adult retail establishment under the Berlin ordinance.  Indeed, under Berlin's understanding of how to apply its ordinance, so long as the business owner demonstrated that the sale of adult materials was not something that was subjectively "meaningful" to him or her, that business owner could stock the store with a limitless amount or percentage of adult materials and the town manager could choose not to enforce the SOB ordinance against that business.

McNair's testimony demonstrates that she has complete discretion as the town manager to decide what she considers a "substantial or significant portion of stock in trade."  The statute provides no explicit standard that operates as a check against the town manager's own personal predilections of what constitutes substantial and significant, nor to applying that standard in an arbitrary manner, i.e., denying VIP's application for zoning compliance while approving the application of another store having the same percentage of adult items for sale.

Furthermore, McNair's focus on the absolute number of adult items in VIP's proposed inventory list is misplaced.  Although Berlin could have chosen to set an absolute number of

-22-

adult items as the qualifying measure for its SOB ordinance, that is not the measure Berlin chose to adopt.  Instead, the town went with "portion of stock in trade," which means a percentage of inventory, not an absolute number of items carried in the store.  Therefore, under the express language of the ordinance, McNair is foreclosed from relying on the bare number of adult items in VIP's proposed inventory – 8,242 – to determine that VIP would have a substantial or significant portion of its stock in trade in adult products; that number must be compared to the total number of inventory items the store intends to sell.

Additionally, in his amicus brief, Connecticut Attorney General Richard Blumenthal raises the point that towns must have the flexibility to determine which businesses qualify as SOBs, noting that many towns in Connecticut have SOB ordinances worded similarly to Berlin's ordinance.  Significantly, however, the Attorney General points out at least eight towns in Connecticut that have adopted an objective percentage to define what constitutes "substantial" or "significant" for purposes of their SOB ordinances.  For example, Bethel, Ansonia, and Shelton define an SOB as any establishment having 10% more of its stock in trade in adult books, magazines, films, materials, and devices.  Cromwell, Durham, Griswold, Mansfield, and Old Saybrook, although having differently worded SOB ordinances, all set a 10% threshold for defining an SOB.

It is not enough to simply say "the business will know whether it is an SOB."  As demonstrated by VIP's trial-and-error effort to determine what percentage of its stock in trade is not substantial or significant, it is not obvious that businesses will simply know whether or not they are required to have an SOB license.  Similarly, Berlin's "I know it when I see it" enforcement standard is not a constitutionally sound standard for a town to employ in interpreting

an SOB ordinance that has the potential to infringe on First Amendment-protected sexual expression. The lack of clarity for both businesses seeking to comply with the ordinance and town officials charged with the ordinance's enforcement will certainly lead to a impermissible chilling effect. VIP has attempted to comply with the SOB ordinance by repeatedly reducing its proposed inventory of "adult" items and yet Berlin has consistently rejected those efforts and refused to state a specific level of adult items in its stock in trade below which VIP could qualify as a general retail establishment. "Although a business owner should be expected to carefully review a governing statute, and perhaps even to inquire of the County officials about the gray areas, he should not be forced to accept a repeated trial-and-error enforcement mechanism because the County refuses to engage in any attempt to clarify the reach of the statute." *Wisconsin Vendors I*, 152 F. Supp. 2d at 1095-96.

Because the statute does not give the person of ordinary intelligence a reasonable opportunity to know what portion of stock in trade would not qualify as substantial or significant or provide explicit standards for those who apply it, VIP has no way of knowing what portion of adult materials it may stock and still be a general retail establishment without engaging in further trial-and-error efforts to apply for a certificate of zoning compliance. As applied to VIP, the ordinance plainly meets the offending factors of a vague law identified in *Grayned*: it fails to provide fair warning to those seeking to comply with its strictures, it fails to prevent arbitrary or discriminatory enforcement by not including any explicit standards for officials charged with its enforcement, and it operates to inhibit the exercise of protected expression. Merely arguing that 8,242 adult items is "a lot" of sexually explicit material does not resolve the issue for VIP of what would constitute a permissible, i.e., non-substantial or insignificant, amount of adult media

or adult products without requiring an SOB license.  From the facts presented here, VIP has a clear likelihood of success in demonstrating that the ordinance is vague as applied to its current business plan; thus, a preliminary injunction is warranted.

**III.     Conclusion**

For the foregoing reasons, VIP's motion for a preliminary injunction (**doc. #138**) is **GRANTED**.  A separate preliminary injunction order will issue.

It is so ordered.

Dated at Bridgeport, Connecticut, this 2nd day of July 2009.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge